IN THE MATTER OF ARBITRATION BETWEEN:

| | | |
|---|---|---|
| OLIN CORPORATION, | ) | |
|       Company, | ) | FMCS: 190321-05419 |
| | ) | |
| and | ) | Grievant: James Jackson |
| | ) | |
| INTERNATIONAL ASSOCIATION OF | ) | |
| MACHINISTS & AEROSPACE WORKERS, | ) | |
| AFL-CIO, DISTRICT 9, | ) | |
| | ) | Arbitrator: Gerard A. Fowler |
|       Union. | ) | |

**Appearances:**

**For the Employer:**

Katherine T. Pearlstone, Esq
Husch Blackwell LLP
4801 Main Street
Kansas City, MO 64112

**For the Union:**

Jason Tetidrick
Assistant Directing Business Representative
159 Shamrock
East Alton, Il 62024

## OPINION AND AWARD

### ISSUE

Did the Company violate the Collective Bargaining Agreement: Article 4, Labor Relations, Section 4.1, Disciplinary Action, Article 12; Article 12, Management Rights, Section 12.1, Functions of Management, by discharging Grievant for engaging in a verbal and physical altercation with a co-worker?

### BACKGROUND OF THE GRIEVENCE

The instant grievance arises under the Collective Bargaining Agreement between Olin Corporation and the International Association of Machinists and Aerospace workers AFL – CIO,

District 9. The Company discharged Grievant, James Jackson, for allegedly violating general plant rule two – six (acting immorally or in decently) by instigating in altercation with a fellow employee. Failing to resolve the matter at the initial stages of the grievance process the matter came forward for hearing on August 21, 2019 at the Best Western Premier hotel in Alton Illinois. Both parties were afforded full opportunity to present testimony and evidence and to examine and cross examine witnesses. A court reporter was present and produced a verbatim transcript of the proceedings. Subsequent to the close of the testimony portion of the hearing the parties submitted briefs of law and fact to the arbitrator and the hearing was officially closed.

## POSITION OF THE COMPANY

Testimony indicated that the Company's operations are partially located in East Alton Illinois in an industrial complex which includes the Winchester division. The Company's employees make ammunition and high explosives, as well as, other materials used for these purposes. One of the six bargaining units at the Company is represented by the Union.

Grievant worked at the Company from 2004 until his termination. At the time of his termination Grievant worked as a scrap disposal operator in the material reclaimed facility department. On February 13, 2014, Grievant received a copy of and training on the Company's general plant rules. On October 15, 2012, Grievant received additional instruction on the Company's general plant rules and confirmed he fully understood the content of the rules.

The Company maintains that it is undisputed that on August 17, 2018, Grievant parked palindromes directly in front of the driver's door of the fellow employee William Haake. The Company maintains that Grievant's conduct is unprecedented, as it is the

first time Grievant ever parked drums in this matter. The Company contends that Grievant's actions led to a verbal and physical altercation between Grievant and Haake. At the hearing, several witnesses testified regarding the specific incidents that led to the termination of Grievant and Haake. The Company presented at the hearing a video of the incidents which led to Grievant's termination.

Testimony indicated that it is common practice for employees to park forklifts in the larger doorways of the garage and that it is not a violation of Company rules or policy to park the forklift in the driveway. Despite parking in the doorway being allowed practice, Grievant complained about forklifts parked in the doorway on multiple occasions. Nothing was done to curb the practice because it was not against any policy or procedure.

On August 17, 2018, Grievant was assigned to run the granulator. Haake was assigned to work in the yard, an assignment that involves the constant handling and moving of explosive materials. Testimony indicated that Foreman, Chad Stahlschmidt became aware of the altercation between Grievant and Haake when he was first notified of the issue with Grievant coming into his office yelling "the mother fucker spit on me". Grievant was aggravated and using profanity. Stahlschmidt directed Grievant to calm down. He subsequently pulled the video recording of the incident which showed Haake and Grievant walking towards each other and engaging in a verbal altercation. The video further showed Grievant throwing up his hands at Haake in an animated fashion as Grievant walked toward Haake.  According to Company testimony, Grievant appeared more engaged in the verbal dispute than Haake. Further, the Company maintains that Grievant demonstrated more aggressive body language than Haake. It is

the Company's opinion that Grievant chose to escalate the encounter which led to the altercation with Haake rather than choosing to walk away. The altercation escalated to physical contact when Haake bumped Grievant.

After watching the video, Stahlschmidt talked to Haake, who informed Stahlschmidt that Grievant had placed drums so close to his forklift that he could not access the vehicle. Stahlschmidt pulled the video recording of Grievant parking the drums which showed Grievant parking the drums in front of the forklift door. Another employee on a forklift attempted to move the drums and failed because of the proximity to Haake's forklift. The video shows Grievant driving pass multiple open spaces on the concrete where he could have parked the drums to get to Haake's forklift. The Company maintains that Grievant parked the drums so close to Haake's forklift that an employee was unable to exit through the doorway. Based on his interactions with Grievant, Stahlschmidt testified that he believes Grievant intentionally parked the drums next to Haake's forklift to aggravate him.

Testimony was introduced through Jennifer Emery who served as a Labor Relations representative. Emory handled internal investigations into ethics and employment related disputes and was involved in the grievance handling process. Emory conducted the investigation into the altercation between Grievant and Haake in consultation with her supervisor, Fred Carpenter. The investigation included witness interviews, witness statements, analysis of video footage and a discharge hearing, all of which were relied upon to make the decision to terminate Grievant's employment.

During testimony the Company elicited responses from Grievant indicating it was not typical for him to place drums next to the forklift door. Grievant also admitted

4

it was wrong to park the drums next to Haake's forklift and it was irritating to Haake to have the forklift door blocked. Emory, along with management of the department and with guidance from her supervisor, Fred Carpenter, made the final decision to terminate Grievant and Haake. Emory testified that verbal altercations are considered a violation of the general plant rules. The Company has terminated several employees for engaging in a verbal altercation, even where there is no physical contact. According to the testimony it is common knowledge that the Company terminates all parties involved in an altercation. The Company also terminates employees for inciting a fight/altercation. An employee that engages in intentional conduct that leads to an altercation can be found to have incited a fight, even if the employee did not have the intent of instigating an altercation.

Testimony by Fred Carpenter indicated that he has worked as director of Human Resources at the Company for seven (7) years. His job responsibilities at the Company include conducting investigations of all sorts, including Worker's Compensation, safety and employee issues. Carpenter was not heavily involved in this matter because he had been assigned to a special project and was traveling three weeks of every month. Therefore, Emory ran the investigation. Carpenter indicated that the purpose of general plant rules is to ensure safety. Inciting a fight is a terminal offense and progressive discipline is not utilized. The Company consistently terminates employees when they incite a fight. When reviewing Grievant's discharge, Carpenter relied on the video recording, witness interviews, and the witness statements.

The Company maintains that it has an obligation to its employees to put into place and to enforce reasonable rules of conduct that prohibit inappropriate and harmful

behavior. The Company argues that Grievant's conduct goes far beyond innocent bickering or harmless banter or horseplay that might exist in the workplace, and it cannot be excused away as innocent. Further, the Company maintains that such conduct is patently inappropriate and unacceptable behavior, and there can be no question that discharge in this case was appropriate. Accordingly, the Company requests that the discharge be upheld and the grievance denied in its entirety.

## POSITION OF THE UNION

The Union maintains that the Company lacked just cause to discharge Grievant. They emphasize that there is no proof that Grievant engaged in any act of fighting, inciting a fight, acting immoral or indecently, or that he violated the Company's Code of Conduct. The Union acknowledges that Grievant and Haake did have a disagreement but Grievant's actions never led to or provoked any action that would be consistent with fighting or inciting a fight. Rather, Grievant did exactly what he had been instructed to do when he believed the other employee's actions had gone over the line, when he made physical contact with Grievant, he disengaged himself in the conversation and reported the incident to his foreman.

Although the Union acknowledges there was an incident on the day in question, they maintain that Grievant was not the person who walked 70 yards to a completely different building to confront another employee. Further, Grievant is not the one that chest bumped or put his hands on anyone. The Union maintains that the video provided at the hearing demonstrates that Haake approached Grievant. When that conversation turned heated and Grievant was chest bumped, and spit on, he asked the other employee if he realized he had just spit on him and had shoved him. Grievant then turned and

6

walked away to report this incident to his supervisor. The Union emphasizes that the entire incident lasted less than 30 seconds, yet the Company claimed at the discharge hearing and the third step grievance meeting that Grievant should have walked away sooner.

The Union faults the Company's testimony that Grievant had intentionally parked his skid too close to the other employee's tractor for him to open the door, thereby inciting a fight. The Union maintains that the video shows that Grievant pulled his tractor directly and without hesitation and set down the skid and backed out. The Union argues that the video does not demonstrate that Grievant deliberately blocked the door of the other forklift. Further, the Union argues that the other employee had several options ranging from using the other door on the forklift to enter the vehicle, going to the bosses office to report the incident so that management could do a proper investigation into the matter and see what the circumstances were, or to ask someone else to move the skid. Instead, Haake decided to walk approximately 70 yards to another building and confront Grievant who was performing his job duties. The Union emphasizes Grievant was not the aggressor in this case, but the victim of a fellow employee who was going through some difficult personal issues outside the workplace and decided to unleash his anger on Grievant.

In conclusion, the Union maintains that the Company failed to conduct a proper investigation of the facts and did not have just cause to terminate Grievant. The Union requests that based on the facts that were presented during the hearing that Grievant be reinstated and made whole for all wages, and benefits that he would have been entitled to as an active employee of the Company. The Union further requests that the Arbitrator

retain jurisdiction over this matter to resolve any disputes or questions which may arise in conjunction with his award.

## DECISION OF THE ARBITRATOR

This arbitration centers on whether the Employer properly discharged Grievant for inciting violence in the workplace. In discharge cases, arbitrators determine two factors: (1) proof of wrongdoing; and (2) whether the penalty was reasonable. Elkouri and Elkouri, *How Arbitration Works,* BNA, Wash. D. C. 6th edition. (2003) p. 948. On the first factor, the Employer bears the burden to prove that the employee committed the act deserving termination by a preponderance of the evidence. *Rock-Tenn Co.*, 127 LA 390 (Englit, 2010) (finding that unless the conduct in question was criminal, employers must prove by a preponderance of the evidence that the employee committed the conduct in question).

The videos provided at the arbitration hearing which documents the conduct upon which the Company made their decision demonstrate clearly that Grievant parked his loader in such a position that employee Haake could not enter from the driver side. This act appears to be part of Grievant's personal crusade to prevent employees from parking their loader in the doorways. The resulting action by Haake; proceeding to Grievant's work area and confronting him is also documented on video. The altercation that occurred in which Grievant was bumped and allegedly spit upon by Haake is also clearly documented. This video evidence in simply not proof of Grievant instigating violence in the workplace.

The next question which must be addressed is whether the penalty of discharge is justified by the conduct on the video recordings. The Company and the Union clearly disagree as to whether Grievant's conduct rose to the level of termination. There was no credible testimony presented which would cast doubt on the validity of the Company's plant rules against inciting a

fight on Company premises. It was established that this policy is important because employees are constantly working in proximity of explosive materials. Further, the code of conduct requirement that employees treat each other with respect is a cornerstone of a positive working environment. However, there simply is no credible evidence to suggest that Grievant could have anticipated the aggressive action taken by Haake when he blocked the driver side access to his loader.

The evidence and testimony clearly established that Grievant did what a reasonable person would do and reported the altercation to a supervisor. The Company's argument that Grievant waited until after he engaged in a war of words with his coworker before he went to his supervisor lacks merit since the evidence demonstrates that the altercation lasted less than 30 seconds, and Grievant immediately to his supervisor to report the incident.

The Union's argument that Grievant did not make physical contact with Haake has merit and clearly obviates the charge that he instigated violence in the workplace. There simply in no evidence that Grievant incited a fight making him subject to discharge is behavior that is listed as The Company's argument that they have consistently applied discipline to others who have incited a fight cannot support discharge of Grievant because in his case no such fight occurred.

Although Grievant claims he didn't intentionally block Haake's access to the forklift the video illustrates that Grievant Parked so closely that another employee could not exit the doorway and another forklift was unable to move the drums due to how tightly they were wedged between Haake's forklift and the garage doorway. So, it is true that Grievant parked the drums next to Haake's forklift but there is simply no way that Grievant could have anticipated that Haake would walk 70 yards to his workplace rather than simply reporting the matter to his supervisor.

The Company argues strongly that immediate termination is warranted when a worker's actions are egregious, or it is highly probable the employee will reoffend. The Company invites the Arbitrator to join them in finding that both factors are present here. The Arbitrator must decline this invitation since the facts at hand do not support such a conclusion.

The Company, in their brief to the Arbitrator as well as their argument at the hearing indicated that Haake was going through a difficult period and that accounts for his behavior and somehow excuses his confrontation of Grievant. The Company even went so far as to introduce testimony indicating that Haake was better liked as an employee then Grievant. This simply should not be a factor in determining who is discharged by an employer under a just cause standard. Although Grievant's actions may have set the stage for the confrontation there was no way he could have known that this would have occurred and that Haake would not have simply reported the incident to a Company manager. Applying the just cause standard to the facts of this case reveals that discharge simply is not warranted given the testimony and video supplied at the hearing. It is important to note that Grievant, prior to this incident, was deemed by everyone testifying at the hearing to be a good and productive employee.

Even construing the Company's arguments in the most favorable light for the Company, it is impossible to determine that Grievant should have been discharged for his actions. Therefore, the Arbitrator finds that the grievance should be sustained, and it shall be so ordered.

## AWARD

In accord with the analysis supra, the grievance is sustained. Grievant is to be reinstated and made whole for all wages, and benefits that he would have been entitled to as an active employee of the Company. The Arbitrator will retain jurisdiction for a period of thirty (30) days the sole purpose of resolving any issues relating to remedy.

So ordered.

Signed this 9th day of January 2020 in the State of Missouri, County of Saint Louis, by:

*Gerard A. Fowler*

Gerard A. Fowler
Arbitrator